**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FX LATINO INC., FXL INVESTMENT PR LLC, RAMON SALVADOR DELGADO-GOMEZ, A/K/A RAMON S. GOMEZ, WALMY RIVERA-SANTIAGO, HECTOR JAVIER SANTOS-PAGAN, JRH SERVICES, INC., AND INFINITY INVESTMENT AND CONSTRUCTION MANAGEMENT CORP.,**<br><br>**Defendants.** | **Case No.** 3:23-cv-1065<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, RESTITUTION, AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I. SUMMARY

1. From at least November 18, 2019, through at least February 8, 2021 (the "Relevant Period"), FX Latino Inc. ("FXL"), by and through Ramon Salvador Delgado-Gomez, a/k/a Ramon S. Gomez ("Gomez"), and Gomez directly, and aided and abetted by, among others, FXL Investment PR LLC ("FXLI"), by and through Gomez, JRH Services Inc. ("JRH"), by and through Walmy Rivera-Santiago ("Rivera"), and Infinity Investment and Construction Management Corp. ("Infinity"), by and through Hector Javier Santos-Pagan ("Santos") (collectively, "Defendants"), conducted a scheme which solicited and accepted at least $17 million in checks, wires, and other traceable forms from over two thousand individuals and

entities (collectively, "pool participants") in Puerto Rico and the continental United States for the purpose of engaging in a pooled investment in retail foreign currency ("forex") trading. In addition, FXL also took in more than $10 million in cash.

2. Rather than use all of pool participants' funds to trade on behalf of the pool, FXL engaged in little to no trading on behalf of the pool. Instead, FXL and Gomez misappropriated at least $13 million of pool participants' funds to pay purported returns and referral commissions to existing pool participants, in a manner typical of a Ponzi scheme. Additionally, Gomez and FXL misappropriated pool participant funds to pay business and personal expenses, and to make payments to Gomez, some of the aiders and abettors, and other unnamed individuals and entities involved in the scheme.

3. FXLI, JRH, and Infinity, by and through, respectively, Gomez, Rivera, and Santos, aided and abetted FXL's and Gomez's misappropriation by, among other things, using FXLI's, JRH's, and Infinity's bank accounts to: 1) accept pool participants' funds; 2) transfer pool participant funds amongst themselves, FXL, Gomez, and other entities and individuals involved in the scheme; and 3) make Ponzi-type payments to pool participants. Indeed, money was moved amongst the aiders' and abettors' bank accounts and those of others involved in the scheme in the manner of a con artist's "shell game."

4. At no time during the Relevant Period was FXL registered with the CFTC as a Commodity Pool Operator ("CPO"), nor was Gomez registered as an associated person ("AP") of a CPO.

5. Most of the pool participants were not eligible contract participants ("ECPs") pursuant to 7 U.S.C. §1a(18)(A)(xi).

6. By this conduct, and the conduct further described herein, FXL and Gomez engaged in, are engaging in, and/or are about to engage in acts and practices in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc); 6b(a)(2) (A), (C); 6o(1)(A), (B); 6k(2), and 6m(1), and 17 C.F.R. §§ 5.2(b)(1), (3) and 5.3(a)(2) (2021).

7. By aiding and abetting FXL's and Gomez's violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6o(1)(A) and (B), and 17 C.F.R. §§ 5.2(b)(1) and (3), FXLI, JRH, and Infinity are responsible for such violations as principals, 7 U.S.C. § 13c(a).

8. Gomez held and exercised direct and indirect control over FXL, and either did not act in good faith, or knowingly induced its violations, and is therefore liable pursuant to 7 U.S.C. § 13c(b), for FXL's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A) and (C), 6o(1)(A) and (B), 6k(2), and 6m(1), and 17 C.F.R. §§ 5.2(b)(1) and (3) and 5.3(a)(2).

9. Gomez, Rivera, and Santos held and exercised direct and indirect control, respectively, over FXLI, JRH, and Infinity, and either did not act in good faith, or knowingly induced their companies' violations, and are therefore liable pursuant to 7 U.S.C. § 13c(b) for their companies' violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6o(1)(A) and (B); and 17 C.F.R. §§ 5.2(b)(1), (3).

10. At all relevant times, Gomez's acts on behalf of FXL were committed within the scope of his employment, agency, or office with FXL. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2021), FXL is liable as principal for Gomez's actions in violation of the Act and Regulations.

11. Unless restrained and enjoined by this Court, Defendants will likely continue to engage in the acts and practices alleged in this Complaint, or in similar illegal acts and practices, as described more fully below.

12. Accordingly, pursuant to 7 U.S.C. §§ 13a-1 and 2(c)(2)(C)(vii), the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act, 7 U.S.C. § 1-26, and Regulations 17 C.F.R. § 1-190 (2021), and to enjoin them from engaging in any commodity-related activity. In addition, the CFTC seeks civil monetary penalties, restitution, and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, rescission, and such other and further relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, U.S.C. § 13a-1(a) authorizes the CFTC to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder. 7 U.S.C. § 2(c)(2)(C)(vii) provides the CFTC with jurisdiction over the forex solicitations and transactions at issue in this action.

14. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants reside in this District or resided in this District during the Relevant Period, transacted business in this District, and certain acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District, among other places.

## III. PARTIES

15. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. §§1-190 (2021). The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street N.W., Washington, DC 20581.

16. Defendant **FX Latino Inc.** is a Puerto Rico corporation with its principal business address in Bayamon, Puerto Rico. FXL was incorporated in Puerto Rico by Gomez in August 2019. In November 2019, FXL was incorporated in New Jersey with Gomez on the board of directors. FXL has never been registered with the CFTC.

17. Defendant **FXL Investment PR LLC** is a Puerto Rico limited liability company with its principal business address in Bayamon, Puerto Rico. FXLI was incorporated in Puerto Rico by Gomez in July 2020. In October 2020, Gomez also incorporated FXLI in New Jersey. FXLI has never been registered with the Commission.

18. Defendant **Ramon Salvador Delgado-Gomez, a/k/a Ramon S. Gomez,** is believed to reside currently in the Dominican Republic. During the Relevant Period, Gomez was a resident of Puerto Rico. Gomez is the President and Secretary of FXL. Gomez is also the President, Vice President, and Secretary of FXLI. Gomez has never been registered with the Commission.

19. Defendant **JRH Services, Inc.** is a Puerto Rico corporation with its business address in Catano, Puerto Rico. JRH was incorporated by Rivera in January 2016. JRH has never been registered with the CFTC.

20. Defendant **Walmy Rivera-Santiago** is a resident of Puerto Rico. Rivera is the President and Secretary of JRH. Rivera has never been registered with the CFTC.

21. Defendant **Infinity Investment and Construction Management Corp.** is a Puerto Rico corporation with its business address in Toa Baja, Puerto Rico. Infinity was incorporated in May 2017. Infinity has never been registered with the CFTC.

22. Defendant **Hector Javier Santos-Pagan** is a resident of Puerto Rico. Santos is the owner of Infinity. Santos has never been registered with the CFTC.

## IV. STATUTORY BACKGROUND

23. A commodity pool is defined, in relevant part, in 7 U.S.C. § 1a(10), as any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests, including any agreement, contract, or transaction described in section in 7 U.S.C. § 2(c)(2)(C)(i)].

24. A commodity pool operator ("CPO") is defined, in relevant part, in Section 1a(11) of the Act, 7 U.S.C. § 1a(11), as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property, either directly or through capital contributions, the sale of stock or other forms or securities or otherwise, for the purpose of trading in commodity interests, including any agreement, contract, or transaction described in 7 U.S.C. § 2(c)(2)(C)(i).

25. An "associated person" ("AP") of a CPO is defined in 17 C.F.R. § 1.3 (2021), as any natural person associated with a commodity pool operator as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) the solicitation of funds, securities, or property

for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

26. Under 17 C.F.R. § 5.1(d)(1) (2021), a CPO who engages in retail forex transactions means any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in section 7 U.S.C. § 1a(18), and that engages in retail forex transactions. Further under 17 C.F.R. § 5.1(d)(2) (2021), an AP of a CPO who engages in retail forex transactions means any natural person associated with a CPO as defined in paragraph (d)(1) of this section as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:

> (i) The solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or
>
> (ii) The supervision of any person or persons so engaged;

27. A futures commission merchant ("FCM") is defined, in relevant part, in 7 U.S.C. § la(28)(A), as an individual, association, partnership, corporation, or trust engaged in soliciting or in accepting orders for, or acting as a counterparty in, among other things, any agreement, contract, or transaction described in 7 U.S.C. §2(c)(2)(C)(i)], and, in connection with these activities, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

28. A retail foreign exchange dealer ("RFED") is defined in 17 C.F.R. § 5.1(h)(1) (2021) as any person that is, or that offers to be, the counterparty to a retail forex transaction with someone that is not an eligible contract participant.

29. An eligible contract participant ("ECP"), as relevant here, is defined in U.S.C. § la(l8)(xi), as an individual acting for his own account who has amounts invested on a discretionary basis, the aggregate of which is in excess of: (i) $10,000,000; or (ii) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

30. Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), provides that the CFTC shall have jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in forex that is offered to, or entered into with, a person that is not an ECP, unless the counterparty, or the person offering to the counterparty, of the person is one of the enumerated exceptions not applicable here.

31. 7 U.S.C. § 13c(a), provides that any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

## V. FACTS

### A. Background

32. From at least February 2019 onward, Gomez held himself out to the public as a professional forex trader. He maintained an Instagram page under the name @fxlatinosignals (which was subsequently changed to @fxlatinos) that solicited customers to purchase memberships from him which would enable the customers to receive coaching and trade signals for trading forex. In addition, from at least late 2019 through early 2020, Gomez conducted public forex trading seminars in Puerto Rico and the continental United States on forex trading for a company that marketed itself as an academy for teaching Spanish-speaking people how to trade forex. That company advertised Gomez as its Chief Instructor and claimed that he was a professional trader with five years' experience and one of the leaders of the forex industry in Puerto Rico.

### B. FXL and Gomez Solicited Pool Participants for a Commodity Pool

33. In August 2019, Gomez incorporated FXL in Puerto Rico. FXL, while operating as a CPO, and Gomez, while acting as an AP of a CPO, solicited individuals, primarily from Puerto Rico, to participate in a pooled investment vehicle that would trade forex. Pool participants were told that their money would be pooled with that of other pool participants and that profits would be generated from using the pooled funds to trade forex. Gomez was to be in charge of trading pool participants' funds. Pool participants were also promised a referral commission for referring new pool participants to FXL.

34. In November 2019, FXL was incorporated in New Jersey by an individual acting in concert with Gomez. Gomez was named in the New Jersey incorporating papers as a Director of FXL along with this individual. Acting in concert with this individual and others, Gomez used

FXL to solicit pool participants in the continental United States. During the Relevant Period, FXL maintained three bank accounts in its name at three different banks in New Jersey. During the Relevant Period, FXL deposited approximately $3 million from pool participants into these three bank accounts.

35. Upon information and belief, the majority of pool participants signed contracts with FXL that promised them a fixed weekly return of 10% of their initial deposit for a period of 52 weeks. At some point during the Relevant Period, FXL changed the terms of its contract such that pool participants were offered the same 10% weekly return, but for a period of only 26 weeks.

36. Initially, pool participants made their checks out directly to FXL. Many pool participants included on the memo line of their checks the Spanish word “inversion,” which translates to “investment”; some included the word “forex.”

37. Between January 2020 and February 2020, FXL deposited approximately $840,000 from approximately 200 pool participants into another bank account, maintained in Puerto Rico; however, sometime in February 2020, the Puerto Rico bank closed the account. Gomez attempted to open an account for FXL at another bank in Puerto Rico, but was turned down by that bank.

38. Following the closure of FXL’s Puerto Rico bank account in or around February 2020, Gomez entered into a scheme with Rivera and Santos, who had been providing administrative services for FXL, to use the bank accounts of their respective companies, JRH and Infinity, to accept money from, and make payments to, FXL pool participants. Rivera and Santos used their companies’ bank accounts to accept approximately $8.8 million from pool participants, primarily from March 2020 through July 2020. During this time period, pool

participants were instructed to make their checks out to JRH or Infinity; however, pool participants' contracts were still between the pool participants and FXL.

39. In an effort to attract even more pool participants to FXL, in or about mid-2020, Gomez entered into arrangements with at least eight other individuals to establish what would become, in essence, feeder funds for FXL. These individuals formed corporate entities in Puerto Rico and/or the continental United States ("Companies 1-5" or "the Companies"), and then used those entities to solicit new pool participants for FXL. The idea was that the Companies would transfer pool participants' funds on to FXL, which would then use those funds to generate profits through forex trading and return those profits to the Companies for payout to pool participants. Gomez was to be in charge of the trading. From approximately July 2020 through at least December 2020, Companies 1-5 took in a combined total of at least $3 million from pool participants.

40. In July 2020, Gomez incorporated FXLI in Puerto Rico; he also incorporated FXLI in New Jersey in October 2020. Gomez used FXLI as a feeder fund to solicit and accept funds from pool participants in both Puerto Rico and the continental United States on behalf of FXL. From approximately July 2020 through at least December 2020, FXLI took in approximately $1.4 million from pool participants.

41. Throughout the Relevant Period, neither Gomez nor FXL made any attempt to determine if the pool participants they were soliciting for FXL, or the pool participants being solicited on behalf of FXL by others, were ECPs under 7 U.S.C. § 1a(18)(A)(xi). In fact, most of FXL's pool participants were not ECPs.

### C. FXL and Gomez, Aided and Abetted by FXLI, JRH, and Infinity, Misappropriated Pool Participants' Funds

42. During the Relevant Period, FXL, FXLI, JRH, Infinity, and Companies 1-5 accepted over $17 million in checks, wire transfers, and other traceable sources from more than two thousand pool participants for the purported purpose of trading forex on behalf of pool participants and paying weekly returns and referral commissions to pool participants from the profits earned by such trading.

43. None of the funds accepted by these entities was ever used to trade forex or any other commodity interest at a registered FCM or a registered RFED.

44. Further, upon information and belief, little if any pool participant funds were used to trade forex at off-shore unregistered trading entities.

45. Rather, FXL and Gomez, aided and abetted by, among others, FXLI, JRH, and Infinity, misappropriated over $13 million of these funds to make Ponzi-type payments to pool participants in order to create the illusion of profitability. In other words, pool participants were paid their purported returns and referral commissions not with the profits from any trading, but with funds invested by other participants. Once received, pool participants' funds were simply transferred amongst the bank accounts of FXL, JRH, Infinity, FXLI, the various Companies, Gomez, and other entities and individuals, and ultimately used to pay pool participants.

46. In addition to using pool participants' funds to make Ponzi-type payments, Gomez personally took more than $100,000 from accounts that held pool participant funds. At least another $200,000 was spent by FXL and Gomez on business and personal expenses.

47. FXL also received more than $10 million in cash from pool participants, presumably for the purpose of trading forex on behalf of pool participants. It is unclear what happened to this $10 million in cash.

48. Although Gomez, Santos, and FXLI opened several commodity interest accounts at FCMs, along with securities accounts at broker-dealer firms, they engaged in no forex or any other trading on behalf of pool participants through these accounts. Rather, the commodity interest accounts were almost completely dormant, and the securities accounts were used merely to hold and transfer pool participants' funds amongst the Defendants and other entities and individuals.

49. Between mid-April 2020 and early January 2021, FXLI and Infinity wired a combined total of approximately $1.2 million of pool participants' funds to an Australian company. Another $500,000 was wired to this same Australian company in July 2020 from a securities account maintained in Santos's name, which was funded primarily from JRH and Infinity bank accounts.

50. Between September and October 2020, FXL and Company 1 wired a combined total of approximately $700,000 of pool participants' funds to a Singaporean company.

51. These funds, totaling approximately $2.4 million, were then moved by the Australian and Singaporean companies to companies located in the Seychelles and Cyprus, respectively. It is unclear whether any of these funds were used to trade forex. None of the funds moved off-shore were ever returned to pool participants via the FXL, FXLI, JRH, Infinity, or Companies 1-5 bank accounts during the Relevant Period.

52. None of the companies described in Paragraphs 49-51 above is registered with the CFTC.

**D. FXLI, JRH, and Infinity Aided and Abetted FXL's and Gomez's Misappropriation**

53. FXLI, JRH, and Infinity, by and through respectively, Gomez, Rivera, and Santos, aided and abetted FXL's and Gomez's misappropriation by using their respective bank accounts

to: 1) accept funds from pool participants on behalf of FXL; 2) transfer pool participants' funds to, and receive pool participants' funds from, each other, FXL, Gomez, various of Companies 1-5, and other entities and individuals; and 3) pay money out to pool participants on behalf of FXL as purported returns and referral commissions.

54. For example, during the Relevant Period, FXLI directly accepted approximately $1.4 million in pool participants' funds on behalf of FXL and paid out approximately $100,000 to pool participants on behalf of FXL; JRH directly accepted approximately $4.8 million in pool participants' funds on behalf of FXL and paid out approximately $8.4 million to pool participants on behalf of FXL; and Infinity directly accepted approximately $4 million in pool participants' funds on behalf of FXL and paid out approximately $80,000 to pool participants on behalf of FXL.

55. JRH paid out a greater amount to pool participants than it received directly from pool participants, while Infinity paid out a smaller amount than it received directly from pool participants. This is due primarily to the substantial movement of pool participant funds between JRH and Infinity, which resulted in a net transfer of over $2.5 million from Infinity to JRH. In addition, JRH received approximately $570,000 from FXL, primarily from pool participant funds, and approximately $500,000 from securities accounts maintained in Santos's name that were funded largely from JRH and Infinity bank account transfers.

56. JRH also provided administrative and bookkeeping services to FXL in furtherance of the scheme, such as maintaining lists of pool participants, records of the amounts each pool participant invested in FXL, and records of the amounts each pool participant received as purported returns and referral commissions from FXL.

57. At all times, FXLI, JRH, and Infinity, by and through respectively, Gomez, Rivera, and Santos, knew that none of the money they accepted from pool participants was being used to trade forex or any other commodity interest.

58. At all times, FXLI, JRH, and Infinity, by and through respectively, Gomez, Rivera, and Santos, knew that they were paying purported returns and referral commissions to pool participants with money invested by other pool participants.

**E. FXL Collapses, Leaving Many Pool Participants with Losses**

59. In or about February 2021, FXL stopped making payments to pool participants. Sometime thereafter, Gomez fled Puerto Rico and is believed to be residing in the Dominican Republic. As of the time FXL ceased making payments, many pool participants had yet to receive payments sufficient to cover their original investment, much less any promised return of profits on their investment.

**F. Gomez was a Controlling Person of FXL and FXLI; Rivera was a Controlling Person of JRH; and Santos was a Controlling Person of Infinity**

60. At all times, Gomez was a controlling person of FXL. Gomez founded and organized FXL in Puerto Rico and was the corporation's President and Secretary. Along with another individual, Gomez established FXL in New Jersey, and was listed in the New Jersey incorporation papers as a Director of the corporation. Gomez was the sole signatory on FXL's Puerto Rico bank account and was a signatory on two of the three FXL bank accounts in New Jersey. In the account opening documents for one of FXL's New Jersey bank accounts, he held himself out as an "Owner with Control of the Entity"; in the documents for another, he held himself out as the President. Gomez devised the scheme and directed the activities of FXL in furtherance of the scheme.

61. At all times, Gomez was a controlling person of FXLI. Gomez founded and organized FXLI in both Puerto Rico and New Jersey, was the corporation's President and Secretary, and was the sole signatory on the corporation's bank accounts. Gomez directed the activities of FXLI in furtherance of the scheme.

62. At all times, Rivera was a controlling person of JRH. She founded and organized JRH, was President and Secretary of JRH, and was a signatory on JRH's bank accounts. She directed the activities of JRH in furtherance of the scheme.

63. At all times, Santos was a controlling person of Infinity. He was the owner of Infinity and was a signatory on one of Infinity's two bank accounts. He directed the activities of Infinity in furtherance of the scheme.

## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of 7 U.S.C. § 6b(a)(2)(A), (C), and 17 C.F.R. § 5.2(b)(1), (3) (2022)**
**FXL and Gomez**
**Misappropriation**

64. Paragraphs 1 through 63 are re-alleged and incorporated herein by reference.

65. 7 U.S.C. § 6b(a)(2)(A) and (C) makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person; [or] . . .
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or

> contract for or, in the case of paragraph (2), with the other person[.]

66. Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex "shall be subject to . . . [7 U.S.C. §] 6b," except in circumstances not relevant here. Moreover, under 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to forex transactions described herein "as if" they were a contract of sale of a commodity for future delivery because they were "offered to, or entered into with, a person that is not an" ECP. Pursuant to 7 U.S.C. § 2(c)(2)(C)(vii), "[t]his Act applies to, and the Commission shall have jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades," forex agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i).

67. 17 C.F.R. § 5.2(b)(1) and (3) provide, in relevant part, that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) [t]o cheat or defraud or attempt to cheat or defraud any person; . . . or (3) [w]illfully to deceive or attempt to deceive any person by any means whatsoever.

68. FXL and Gomez, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail forex transactions, knowingly or recklessly misappropriated at least $13 million of pool participants' funds to pay purported returns and referral commissions to existing pool participants in a manner typical of a Ponzi scheme. Additionally, Gomez and FXL knowingly or recklessly misappropriated pool participant funds to pay business and personal expenses and to make payments to Gomez, some of the aiders and abettors, and other unnamed individuals and entities involved in the scheme.

69. By misappropriating pool participant funds, FXL and Gomez violated 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

70. Each act of misappropriation, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

71. Gomez held and exercised direct and indirect control over FXL and either did not act in good faith or knowingly induced FXL's violations, and is therefore liable pursuant to 7 U.S.C. § 13c(b) for FXL's violations of 7 U.S.C. § 6b(a)(2)(A) and (C), and 17 C.F.R. § 5.2(b)(1) and (3).

72. The foregoing acts occurred within the scope of Gomez's employment or office with FXL. Therefore, FXL is liable for his misappropriation in violation of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1) and (3) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2021).

## COUNT TWO

### Violations of 7 U.S.C. §6*o*(1)
### FXL and Gomez
### Misappropriation by a CPO and AP of a CPO

73. Paragraphs 1 through 63 are re-alleged and incorporated herein by reference.

74. 7 U.S.C. § 1a(11)(A)(i) defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—(I) commodity for future delivery, security futures product, or swap; [or] (II) agreement, contract, or transaction described in [7 U.S.C.] 2(c)(2)(C)(i) or [17 C.F..R] 2(c)(2)(D)(i) [of the Act].

75. For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) (2021), as any person who operates or solicits funds, securities, or property for a pooled

investment vehicle that is not an ECP, as defined in 17 C.F.R. § 1a(18), and who engages in retail forex transactions.

76. Pursuant to 7 U.S.C. § 2(c)(2)(C)(vii), "the Commission shall have jurisdiction over, an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in [retail forex]."

77. Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles "shall be subject to . . . [7 U.S.C. §] 6*o*," except in circumstances not relevant here.

78. 17 C.F.R. § 1.3 (2021), defines an AP of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

79. Pursuant to 17 C.F.R. § 5.1(d)(2) (2021), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a CPO.

80. 7 U.S.C. § 1a(18)(A)(xi), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

81. During the Relevant Period, FXL solicited funds, securities, or property for a pooled investment vehicle that is not an ECP for the purpose of engaging in retail forex

transactions; therefore, FXL acted as a CPO as defined by 7 U.S.C. § 1a(11) and17 C.F.R. § 5.1(d)(1).

82. During the Relevant Period, Gomez was associated with FXL, a CPO, as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool; therefore, Gomez was an AP of a CPO as defined by 17 C.F.R. § 1.3 and 17 C.F.R. § 5.1(d)(2).

83. 7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from (A) employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or (B) engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

84. FXL and Gomez, while acting as an unregistered CPO and AP, respectively, through use of the mails or any means or instrumentality of interstate commerce misappropriated at least $13 million of pool participants' funds to pay purported returns and referral commissions to existing pool participants in a manner typical of a Ponzi scheme. Additionally, Gomez and FXL misappropriated pool participant funds to pay business and personal expenses and to make payments to Gomez, some of the aiders and abettors, and other unnamed individuals and entities involved in the scheme.

85. By misappropriating pool participant funds, FXL and Gomez violated 7 U.S.C. § 6*o*(1).

86. Each act of misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

87. Gomez held and exercised direct and indirect control over FXL and either did not act in good faith or knowingly induced FXL's violations and is therefore liable pursuant to 7 U.S.C. § 13c(b) for FXL's violations of 7 U.S.C. § 6*o*(1).

88. The foregoing acts, occurred within the scope of Gomez's employment or office with FXL. Therefore, FXL is liable for his misappropriation in violation of 7 U.S.C. § 6*o* pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 .

## COUNT THREE

### Violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) 6k, and 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2022)
### FXL and Gomez
### Failure to Register as a CPO or an AP of a CPO

89. Paragraphs 1 through 63 are re-alleged and incorporated herein by reference.

90. 7 U.S.C. § 1a(11)(A)(i) defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—(I) commodity for future delivery, security futures product, or swap; [or] (II) agreement, contract, or transaction described in [7 U.S.C.] 2(c)(2)(C)(i) or [17 C.F..R] 2(c)(2)(D)(i) [of the Act].

91. For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP, as defined in 17 C.F.R. § 1a(18), and who engages in retail forex transactions.

92. Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the

mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

93. Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states, in part, that:

> A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not— . . .
>
> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [retail forex contracts, agreements, or transactions] . . . .

94. Except in circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(i) (2021), requires those that meet the definition of retail forex CPO under 17 C.F.R. §5.1(d) to register as a CPO with the Commission.

95. 17 C.F.R. § 1.3 defines an AP of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

96. Pursuant to 17 C.F.R. § 5.1(d)(2) (2021), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a CPO.

97. Except in certain circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(ii) requires those that meet the definition of an AP of a CPO under 17 C.FR. § 5.1(d) to register with the Commission.

98. During the Relevant Period, FXL solicited funds, securities, or property for a pooled investment vehicle that is not an ECP for the purpose of engaging in retail forex transactions; therefore, FXL acted as a CPO as defined by 7 U.S.C. § 1a(11) and17 C.F.R. § 5.1(d)(1).

99. FXL, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO, in violation of 7 U.S.C. §§ 2(2)(C)(iii)(I)(cc) and 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

100. During the Relevant Period, Gomez associated with FXL, a CPO, as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool and/or a pooled investment vehicle in retail forex; therefore, Gomez acted as an AP of a CPO as defined by 17 C.F.R. §5.1(d)(2).

101. Gomez was not registered with the Commission as an AP of FXL; therefore, Gomez acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii).

102. Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall be:

> [U]nlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent . . . in any capacity that involves
>
> (i) the solicitation of funds, securities, or property for a participation in a commodity pool or
>
> (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

103. While associated with FXL and while acting in an unregistered capacity, Gomez solicited pool participant funds for a forex pool, in violation of 7 U.S.C. § 6k(2).

104. FXL supervised Gomez and permitted him to solicit pool participants for the forex pool knowing that he was unregistered, in violation of 7 U.S.C. § 6k(2).

105. Each instance that Gomez acted as an AP but failed to register with the Commission as an AP is alleged as a separate and distinct violation.

106. Each instance that FXL permitted Gomez to act as an unregistered AP of a CPO is alleged as a separate and distinct violation.

107. Gomez held and exercised direct and indirect control over FXL and either did not act in good faith or knowingly induced FXL's violations and is therefore liable pursuant to 7 U.S.C. § 13c(b) for FXL's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k, and 6m(1), and 17 C.F.R. § 5.3(a)(2)(i).

108. The foregoing acts, occurred within the scope of Gomez's employment or office with FXL. Therefore, FXL is liable for his violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6k and 17 C.F.R. § 5.3(a)(2)(i).

## COUNT FOUR

**Violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3) (2021)**
**FXLI, JRH, Infinity, Gomez, Rivera, and Santos**
**Aiding and Abetting FXL's and Gomez's Violations**

109. Paragraphs 1 through 63 are re-alleged and incorporated herein by reference.

110. 7 U.S.C. § 13a(1) provides that:

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who

> willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

111. As alleged above, FXL and Gomez misappropriated at least $13 million of pool participants' funds to pay purported returns and referral commissions to existing pool participants in a manner typical of a Ponzi scheme. Additionally, Gomez and FXL misappropriated pool participant funds to pay business and personal expenses and to make payments to Gomez, some of the aiders and abettors, and other unnamed individuals and entities involved in the scheme, all in violation of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1), and 17 C.F.R. § 5.2(b)(1) and (3).

112. By knowingly using their bank accounts to: (1) receive funds from pool participants; (2) freely transfer pool participants' funds to FXL, Gomez, one or more of Companies 1-5, and other entities and individuals; and (3) pay money out to pool participants as purported returns, FXLI, JRH, and Infinity aided and abetted FXL's and Gomez's violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1) and 17 C.F.R. § 5.2(b)(1) and (3), and acted in combination or concert with FXL and Gomez in the commission thereof.

113. By knowingly providing bookkeeping and administrative services to FXL and Gomez, such as maintaining lists of pool participants, records of the amounts each pool participant invested in FXL, and records of the amounts each received as purported returns from FXL, JRH aided and abetted FXL's and Gomez's violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1) and 17 C.F.R. § 5.2(b)(1) and (3), and acted in combination or concert with FXL and Gomez in the commission thereof.

114. Therefore, pursuant to 7 U.S.C. § 13c(a), FXLI, JRH, and Infinity are responsible for each violation of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1)(A) and (B) and 17 C.F.R. § 5.2(b)(1) and (3) committed by FXL and Gomez as principals.

115. Gomez held and exercised direct and indirect control over FXLI and either did not act in good faith or knowingly induced FXLI's actions to aid and abet and act in combination or concert with FXL and Gomez, and is therefore liable pursuant to 7 U.S.C. § 13c(b) for FXL's violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1)(A) and (B) and 17 C.F.R. § 5.2(b)(1) and (3).

116. Rivera held and exercised direct and indirect control over JRH and either did not act in good faith or knowingly induced JRH's actions to aid and abet and act in combination or concert with FXL and Gomez, and is therefore liable pursuant to 7 U.S.C. § 13c(b) for JRH's violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1)(A) and (B) and 17 C.F.R. § 5.2(b)(1) and (3).

117. Santos held and exercised direct and indirect control over Infinity and either did not act in good faith or knowingly induced Infinity's actions to aid and abet and act in combination or concert with FXL and Gomez, and is therefore liable pursuant to 7 U.S.C. § 13c(b), for Infinity's violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1)(A) and (B) and 17 C.F.R. § 5.2(b)(1) and (3).

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1 and pursuant to its own equitable powers:

A. Find that FXL and Gomez violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc); 6k, 6m(1); 6b(a)(2)(A), (C); 6*o*(1)(A), (B), and Regulations 5.2(b)(1), (3) and 5.3(a)(2)(i), 17 C.F.R. §§ 5.2(b)(1), (3) and 5.3(a)(2)(i) (2021);

B. Find that FXLI, JRH, and Infinity, Gomez, Rivera and Santos violated, 7 U.S.C. §§ 6b(a)(2)(A) and (C) and 6*o*(1)(A) and (B) and 17 C.F.R. § 5.2(b)(1) and (3);

C. Enter an order of permanent injunction, enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging in conduct in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A) and (C), 6k, 6m(1), and 6*o*(1), and 17 C.F.R. §§ 5.2(b)(1) and (3) and 5.3(a)(2)(i);

D. Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them from, directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by 7 U.S.C. § 1a(40);

2) Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3 (2021)), for accounts held in the name of Defendants or for accounts in which Defendants have a direct or indirect interest;

3) Having any commodity interests traded on Defendants' behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9) (2022); and

7) Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

E. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and Regulations as described herein, including plus pre-judgment interest;

F. Enter an order directing Defendants and any of their successors, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G. Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the participants whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

H. Enter an order requiring Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see*, 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described herein;

I. Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

J. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Respectfully Submitted,

*/s/ Alan Edelman*

____________________________________

Alan I. Edelman
Government Attorney No. G03803
Senior Trial Attorney
*aedelman@cftc.gov*
Aimée Latimer-Zayets
Chief Trial Attorney
*alatimerzayets@cftc.gov*
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, DC 20581
Telephone: (202) 418-5000
Attorneys for Plaintiff

Dated: February 10, 2022